[File No. 5952.]

JACOB KIST, Respondent, v. FRED KIST, Appellant.

(243 N. W. 820.)

Opinion filed February 25, 1932.   On rehearing August 2, 1932.

*Conmy, Young & Conmy,* for appellant.

410.

*Kelsch & Higgins,* for respondent.

BURKE, J. This is an appeal from a judgment in a personal injury action in which Jacob Kist is plaintiff and his brother, Fred Kist, is the defendant.

At the close of the plaintiff's testimony the defendant moved for a dismissal of the case, first, on the ground that there was no evidence to support the complaint, and second, that the undisputed evidence showed contributory negligence on the part of plaintiff as a matter of law. The motion was overruled and the same motion made again at the close of all the testimony was overruled.

Jacob Kist, the plaintiff, lives at Linton, North Dakota, and his brother, the defendant, lives at Mandan, North Dakota. On or about the 12th day of February, 1930, the defendant called the plaintiff by phone and asked him to come to Mandan. He told the plaintiff that a Mr. Hausauer and his daughter, from Jamestown, were visiting him at Mandan; that he was going to drive them to their home in Jamestown, North Dakota, and he wanted Jacob to come to Mandan and go with him on the trip. Jacob refused to come, giving as a reason, that he could not drive his car as there was too much snow on the road. On the 13th day of February, Fred called Jacob again and asked him to come from Linton to McKenzie on the train and meet the party at that place en route to Jamestown. Jacob came to McKenzie on the train, joined the party at that place, Jacob riding in the back seat with Mr. Hausauer, Fred and the woman riding in the front seat of Fred's car. Before leaving McKenzie, Fred told Jacob that he wanted him (Jacob) to see and become acquainted with the woman, as he intended to marry her and subsequently he did marry her.

When they arrived at Sterling the roads were so blocked with snow that Jacob wanted to turn back and send Mr. Hausauer and daughter on to Jamestown by train, but Fred insisted on going through with the car. There was a great deal of snow all the way to Steele. After leaving Steele there was no snow on the road between that point and Jamestown and according to the testimony they drove about forty to fifty miles an hour. Both Fred and Jacob had driven cars for many years and Fred had the reputation of being a fast, careless driver, and

this reputation was known to Jacob. Sometime prior to the accident, the evidence does not show just when, Fred had an accident in which his car upset and his wife was killed, the circumstances and the details of which were known to the plaintiff. Fred was familiar with the road. He had been over it just a few days before, when he took Hausauer and his daughter from Jamestown to Mandan. He knew that about a half or three quarters of a mile west of Jamestown there is a long curve in the road and he testified: "As I approached this turn I was driving about forty or forty-five miles per hour, something like forty or fifty miles per hour. Hausauer said slow down a little or you will go past Jamestown. I was a little back of the curve at that time. I looked to see where I was and then turned my head to the front. I was then too far along to turn. The turn was plenty wide enough. I had passed the turn too far before I turned in. The fact is I made a very sharp turn. I busted the right front wheel or the tire busted or something. Anyway, she slew over into the ditch. The front wheel broke and the car skidded up against the bank." As witness for the defense he stated: "I wanted my brother to advise me on the woman I was getting for my wife. I would be better satisfied if I had my brother with me. As I approached the corner, Hausauer said be careful or you will drive past Jamestown. I turned my head when he made this remark. I made my turn and made it too quick and the car tipped over. There was no time to put on the brakes. I cannot say when I bought the car, but it had been driven five or six thousand miles. It was in good condition. My brother and I have driven together numerous times. He has driven with me and I have driven with him. I carry a policy of insurance for five thousand dollars and I think Mr. Conmy is only nominally representing me." Fred paid a part of Jacob's hospital bill while in the hospital at Jamestown and went to see him several times while he was in the hospital. Jacob testified: "That from the time we left Steele until the accident happened (a distance of about sixty miles) he was going forty or fifty miles per hour. Anybody that drives a car knows about what speed a car goes. I did not protest as to the speed and I did not ask him at any time not to go so fast. I knew he had to turn to go into Jamestown; I had been over the road before in the night and knew there was a long curve in the road. I had driven with Fred before and knew he

had had an accident while driving his automobile, knew that he had the reputation of being a careless driver. He was driving as usual on this particular drive. I could not say as to the speed, but he was going fast. I knew Fred had a similar accident before, in which his former wife was killed. I knew he was driving forty or fifty miles when he approached the curve. I knew before the accident that Fred had the reputation of being a careless driver. It was still daylight and we could see a considerable distance. Before we made the turn Hausauer said to Fred, do not go by Jamestown. The turn that Fred made was a sharp turn. He was going very fast and as he started to make the turn the car started to slide." It is admitted that there are markers on the road showing the curve, but none of the occupants of the car saw them. They all say they were going very fast, but none of them looked at the speedometer.

It is the contention of the appellant that the court erred in overruling the defendant's objection to the following question:

Q. I will ask you whether or not in your judgment driving a Reo sedan on a gravelled highway, such as Highway No. 10, on a straight away road, at the rate of forty to fifty miles an hour, is a safe or unsafe rate of speed to travel at?

Mr. Conmy: Object to that as incompetent, irrelevant and immaterial calling for the expert opinion of this witness on a matter which is not the subject of expert testimony. On the further ground that there is no proper foundation laid for the question, calling for the conclusion of this witness on a matter which is within the field of the jury, and invades the province of the jury.

The Court: Objection overruled.

A. I do not.

Q. Do you call it safe or unsafe? Do you regard it as safe or unsafe?

A. I regard it as safe.

Q. Tell the jury what you mean by a safe rate of speed?

A. I figure a safe rate of speed is forty to fifty miles an hour. That is a safe rate of speed if you want to maintain it, as long as the road is straight and the vision is clear, staying on the right side of the road.

Mr. Conmy: May I now add to my objection and move to strike out the answer on the further ground that it does not appear that this wit-

ness is basing his answer and testimony regarding driving on a road having the identical conditions that this particular road had at this particular time. He don't know what the condition of the road was at that time.

The Court: Objection overruled. Motion denied.

We are of the opinion that this question calls for a conclusion of the witness, which was solely in the province of the jury.

According to the evidence, the defendant, at the time of the accident, was driving at from forty to fifty miles per hour, an unlawful rate of speed under any conditions, according to chapter 162, laws of 1927.

The defendant states he was back some distance from the curve when Hausauer said better slow up or we will go by Jamestown. He turned his head, looked back and immediately looked forward, but in the meantime he had gone so far he could not make the turn. He must have been going very fast. According to the testimony, the only reason he could not make the turn was because he had gone too far when he tried to make it. If he had not been going so fast he would not have gone so far and could have safely made the turn. The contributory negligence of the plaintiff was an issue and the purpose of the testimony was to eliminate as far as possible the question of such contributory negligence. If it was safe to drive forty-five or fifty miles per hour on that highway in its condition at that time of the year, there would be no reason why the plaintiff should object to the speed and the turn at the curve was so sharp and sudden that he did not have time to object.

The plaintiff was an experienced driver of automobiles, so much so that he testified he could tell, when riding in an automobile, about how fast it was going. He had ridden with his brother; he knew his brother's reputation as a fast, reckless driver; he knew that a short time before, that his brother, while driving the same car, had an accident in which the car turned over and his brother's wife was killed. He had often ridden in his brother's car when his brother was driving and his brother often rode with him when he was driving.

There was a very warm brotherly feeling existing between the plaintiff and defendant, as shown by the defendant's visit to the plaintiff while in the hospital, his paying a part of the hospital expenses, his

consulting with plaintiff's attorney, his admission that Mr. Conmy was only nominally his attorney, his very apparent willingness to take the blame for the accident and the fact that he had a great respect for the opinion and advice of the plaintiff, as shown by his anxiety to have his brother's advice in regard to the woman he wanted to marry. Doubtless, if the plaintiff had requested the defendant to drive slower, the request would have been granted. He did not make such a request and when asked "You did not care whether he was going fast or not?" he answered, "Well, I did not. All I know he was going pretty fast."

If the jury believed the evidence that it was safe to drive forty-five or fifty miles per hour, then there could be no contributory negligence on the part of the plaintiff, for he did not have time to object at the turn. This is what the evidence proves, if it is true. This is what it was offered for and it was, no doubt, strenuously argued to with prejudicial effect.

Whether the rate of speed was negligent and whether it contributed to the accident was a question for the jury. Smith v. Northern P. R. Co. 3 N. D. 555, 58 N. W. 345; Dolan v. O'Rourke, 56 N. D. 421, 217 N. W. 666; American Soda Fountain Co. v. Hogue, 17 N. D. 375, 17 L.R.A.(N.S.) 1113, 116 N. W. 339; Halvorson v. Zimmerman, 56 N. D. 607, 218 N. W. 862.

"The normal function of a witness is merely to state facts within his personal knowledge and under ordinary circumstances his opinion or conclusion with respect to matters in issue or relevant to the issue cannot be received." 22 C. J. 485, § 588.

The appellant's second specification of error is the sustaining of an objection to the following question, namely:

"Q. Would you say that this accident was the result of his lack of skill as a driver?"

This question also called for a conclusion of the witness and there was no error in the courts sustaining the objection.

"A witness should not be permitted to give his own opinion as to the competency of a person who drives an automobile, as the jury is capable of drawing the proper inference from a statement of the facts." Huddy, Auto. (8th ed.) § 1266; Shaw v. Skopp, 198 App. Div. 618, 190 N. Y. Supp. 859; Pantages v. Seattle Electric Co. 55 Wash. 453,

104 Pac. 629; Jackson v. Vaughn, 204 Ala. 543, 86 So. 469; Kelly v. Waterbury, 96 Conn. 494, 114 Atl. 530, 21 N. C. C. A. 155.

Appellant's third and last assignment of error is the overruling of his motion for a directed verdict on the ground

First: That there is no evidence of negligence on the part of the defendant proximately causing the injury, and

Second: That the undisputed evidence shows the plaintiff was guilty of contributory negligence as a matter of law.

There is no merit in the first contention as the jury might well have found from the evidence that the defendant was negligent. Contributory negligence is always a question of fact for the jury, unless it can be said that from the evidence different minds cannot reasonably draw different conclusions either as to the facts or the deductions to be drawn from the facts. Dougherty v. Davis, 48 N. D. 883, 187 N. W. 616; Martin v. Parkins, 55 N. D. 339, 213 N. W. 574; Morrison v. Lee, 16 N. D. 377, 13 L.R.A.(N.S.) 650, 113 N. W. 1025; Ferm v. Great Northern R. Co. 53 N. D. 543, 207 N. W. 39.

We cannot say from the evidence in this case that different minds might not reasonably draw different conclusions from the evidence.

The question of contributory negligence and the corresponding duties of the driver of an automobile and his guests was submitted to the jury on instructions, which were favorably passed upon in the case of Eddy v. Wells, 59 N. D. 663, 231 N. W. 785. The rights and duties of a driver and his guests are thoroughly reviewed in the said case, but see also Bolton v. Wells, 58 N. D. 286, 225 N. W. 791; Olson v. Hermansen, 196 Wis. 614, 61 A.L.R. 1243, 220 N. W. 203; Waters v. Markham, 204 Wis. 332, 235 N. W. 797; Page v. Page, 199 Wis. 641, 227 N. W. 233; Cleary v. Eckert, 191 Wis. 114, 51 A.L.R. 576, 210 N. W. 267; Sharp v. Sproat, 111 Kan. 735, 26 A.L.R. 1421, 208 Pac. 613; Higgins v. Mason, 255 N. Y. 104, 174 N. E. 77; Marple v. Haddad, 103 W. Va. 508, 61 A.L.R. 1252, 138 S. E. 113; Biersach v. Wechselberg, 206 Wis. 113, 238 N. W. 905.

Upon the error pointed out in this case, a new trial is ordered.

CHRISTIANSON, Ch. J., and NUESSLE and BURR, JJ., concur.

BIRDZELL, J., dissents.

BURKE, J. (On re-argument). Re-argument was ordered and had in this case and after due consideration of the petition for a rehearing and the argument made on rehearing the court adheres to its former opinion.